HARTZ, Circuit Judge,
concurring and dissenting:
I agree that the summary judgment in favor of the government must be set aside. Reading the evidence in the record before us in the light most favorable to Ms. Bay-less, one could say that a person in her situation acting with reasonable diligence would not have discovered the cause of her ailments more than two years before she filed her FTCA claim.
But the majority opinion does more than set aside the government’s summary judgment. It grants a (partial) summary judgment to Ms. Bayless on the limitations-period issue. It holds as a matter of law that she filed her claim in a timely manner. It so holds even though Ms. Bayless did not seek such a ruling in district court[1] and did not argue in support of such a ruling in this court.[2] The 2010 amendments to Fed.R.Civ.P. 56 now prohibit the district court from sua sponte granting summary judgment (and presumably partial summary judgment as well) without “giving notice and a reasonable time to respond.” Id. Rule 56(f). The majority apparently do not believe that a similar principle should apply on appeal. But why not give the government the same opportunity it would have in district court? Indeed, why not follow our customary practice of deciding only the issues presented to us and remanding further matters to the district court? Because I think the relief granted by the majority opinion is *1248 inappropriate in the circumstances of this case, I dissent from the majority opinion insofar as it holds that Ms. Bayless’s claim was timely.
The majority opinion states that it is not “willing to engage in speculation” that the government could successfully contest its decision. Majority Op. at 1247 n. 9. It assumes that there is nothing that the government could have presented or argued that could change the result. But not only does such an assumption run contrary to our tradition of providing notice and an opportunity to respond before rendering a ruling, it suffers from the sin of speculation attributed to my view. I would rather speculate in favor of affording due process than speculate to support its denial.
So let me suggest how the government might have grounds to oppose a motion for partial summary judgment by Ms. Bayless. For one thing, the majority opinion assumes the accuracy of all of Ms. Bayless’s testimony. How can we be certain that the government does not have evidence that would challenge that accuracy? There would have been no reason for the government to put on such evidence in support of its motion for summary judgment. After all, it needed to base its motion on undisputed facts. Impeaching Ms. Bayless’s testimony would have accomplished nothing, because the court would nevertheless have to credit her veracity and the reliability of her memory. Accordingly, the government set forth a summary of her deposition testimony as stating undisputed facts. Those undisputed facts, however, were undisputed “only for the purpose of presenting a legal theory, which, if accepted by the court, would entitle the government to a judgment.” United States v. Mills, 372 F.2d 693, 697 (10th Cir.1966); see 10A Charles A. Wright et al., Federal Practice and Procedure § 2720 (3d ed. 1998) (“[A] party. moving for summary judgment concedes the absence of a factual issue and the truth of the non moving party’s allegations only for purposes of his own motion.” (emphasis added)). On the other hand, if Ms. Bayless had moved for partial summary judgment, perhaps the government could have defeated the motion by presenting evidence contrary to hers on the facts essential to her motion.
The approach of the majority opinion will work a sea change in summary-judgment practice. A party seeking summary judgment will now have to protect itself by presenting all evidence that could impeach evidence favoring the opposing party. Such evidence, of course, is irrelevant to the summary-judgment motion because the court reviewing the motion must view the evidence in the light most favorable to the nonmovant. But if the moving party does not include impeaching evidence, it could face a court that follows the precedent established by the majority opinion and (1) construes the nonmovant’s opposition to the summary-judgment motion as a request for a judicial determination that the nonmovant is entitled to summary judgment (or at least partial summary judgment on the issue) and (2) refuses “to engage in speculation that the [movant] might have additional cards in its hand ... which might turn the tide in its favor at trial.” Majority Op. at 1247 n. 9.
The only advantage I can see to such an unfair procedure is that it will save paper otherwise used in litigating cross-motions for summary judgment. Why file a cross-motion when you have a better chance of a favorable ruling by just opposing the other party’s motion? If Ms. Bayless had moved for a partial summary judgment that her complaint was timely, the government would then have been alerted to the need to put on any evidence it had that would cast doubt on Ms. Bayless’s assertions rel *1249 evant to the limitations issue. By not so moving, Ms. Bayless would avoid alerting the government that it needed to respond. How much better simply to oppose the government’s motion and not take a chance that her account could be impeached? If there is any precedent for the approach of the majority opinion, I am not aware of it.
Moreover, even on the limited evidence now before us, the government could marshal arguments that Ms. Bayless’s rendition of facts (which had to be accepted as true for purposes of the government’s motion) is actually unlikely and that a reasonably diligent person in Ms. Bayless’s situation would have discovered the cause of her ailments significantly sooner than she did. It is important to keep in mind the legal standard. The discovery-rule analysis depends on what the plaintiff knew as time progressed. “The exercise of reasonable diligence is an ongoing process. What is required at any particular time depends on what one has notice of at that time. When additional information is obtained, the standard of reasonable diligence may demand action that would not have been demanded without receipt of the information.” United States v. Denny, 694 F.3d 1185, 1190 (10th Cir.2012). One could argue from the record evidence that in early 2005 Ms. Bayless had acquired information mandating that she obtain scientific testing of whether she had been exposed to sarin gas but that she had delayed an unreasonably long time before doing so.
If we examine the evidence at hand in the light most favorable to the United States rather than, as in the majority opinion, the light most favorable to Ms. Bay-less, we get the following picture. ' By early 2005 Ms. Bayless had learned (1) that where she had been working shortly before her ailments first arose was near a military facility where sarin gas was present and (2) that her ailments were similar to those of a man who had been exposed to sarin at that facility. On May 4, 2005, she wrote to Mr. Queen, a clinical nutritionist who had been treating her, that she was “pretty sure” that her problems had been caused by exposure to nerve agents, probably sarin gas. App. to Aplt. Br. at 116. I do not think that the majority would disagree that a reasonably diligent person would promptly follow up on that belief. So what did she do?
On February 1, 2005, Mr. Queen had told her that the Institute of Orthomolecu-lar Medicine “would probably have a way to test for [nerve agents]” and that “the information may be very useful.” She admits, however, that she did not follow up on this advice.
Also, in July, August, or September of 2005, Mr. Queen had her take huperzine, saying that it would reheve her symptoms if they were caused by sarin. After a few days, however, her symptoms only got worse, so she quit using it. If that were the only reason that Ms. Bayless quit investigating whether sarin had caused her problems, I would not agree that she was acting as a reasonable person in that regard. Mr. Queen was not a doctor. And huperzine is a Spanish club moss, not a prescription medication. A reasonable person would not have relied on the huper-zine trial as reason not to pursue sarin as a cause.
The majority opinion suggests that a negative PCR test in December 2006 also deterred Ms. Bayless from investigating sarin gas as the cause of her condition. But the PCR test was for exposure to biological weapons. Sarin is not a biological weapon.
What about the acetylcholine test? Ms. Bayless testified that she had learned from Internet research by February 2005 that such a test could help decide whether she *1250 was suffering from exposure to nerve gas. And a test of that nature (the record before us leaves unclear whether it was an identical test) is ultimately what she bases her present claim on. To act with reasonable diligence she would have needed to pursue scientific testing for exposure to nerve gas in early 2005. Contrary to the majority opinion, however, there is a reasonable question whether she did. Ms. Bayless testified that because of the importance of the test, she had it performed in 2005. But her recollection may have been mistaken. At her deposition she, quite understandably, expressed uncertainty about a number of matters in her medical history, including events in 2005. Turning specifically to the acetylcholine test, the record before us contains no report of such a test in 2005 or any mention of such a test in the medical records for that year. (Of course, the parties may have documentation of such a test. But, in light of Ms. Bayless’s testimony, it would have been irrelevant to any issue on appeal, so there would have been no reason to include it in the appendix. Guessing about what evidence there may be is a hazard in addressing an issue never addressed by the parties on appeal.) Although Ms. Bayless testified that the test was performed by Dr. Moody, his office notes clearly show that her last visit with him was on May 3, 2005, the day before she wrote the message to Mr. Queen that she was “pretty sure” that sarin was the culprit. Dr. Moody’s notes for May 3 do include the notation “test results,” but we do not know what the tests were. Id. at 113. If Dr. Moody gave her the (negative) result of the acetylcholine test on that date, it would be strange for her to write her message to Mr. Queen the next day. And if the notation was to indicate that Dr. Moody should call her -with the results, it would be strange for her to write her “pretty sure” message without awaiting the results or even mentioning that she was awaiting results. In addition, Ms. Bayless testified that sometime between July and September of 2005 she tried hu-perzine for a few days. But why was she still being tested for sarin if she had earlier received test results (the acetylcholine test) that convinced her that sarin was not the cause of her ailments?
Thus, a reasonable factfinder could find that Ms. Bayless’s decision in 2005 not to pursue sarin was the result of the huper-zine trial, not a nonexistent acetylcholine test. And if that were the case, I would say that Ms. Bayless had not acted with reasonable diligence and that a reasonably diligent person in her situation would have discovered the sarin connection substantially before she actually did.
For these reasons, I dissent from the decision of the majority that as a matter of law Ms. Bayless’s claim was timely.

. The pertinent heading in Ms. Bayless’s response to the government's summary-judgment motion was "Plaintiff’s Initiation of this Action Against the United States on January 31, 2008, was Timely under the Facts and Circumstances Presented." Pl.’s Resp. to Defs.' Mot. for Summ. J. at 7 (Bayless v. United States, No. 2:09cv00495 DAK (D.Utah Jan. 11, 2012) (emphasis added)). It is one thing to argue that her complaint was timely if the evidence conceded to be true for purposes of the government’s motion is viewed in the light most favorable to Ms. Bayless; it is quite another to argue that her complaint was timely if that same evidence, supplemented by any other (at this point unknown) contrary evidence that the government may offer, is viewed in the light most favorable to the government. Only the first argument was made by Ms. Bayless in district court. And the district court, correctly believing that Ms. Bayless had not sought any affirmative relief on the issue, began its Memorandum Decision and Order by saying, "This matter is before the court on Defendant the United States of America's Motion for Summary Judgment.” Mem. Decision & Order at 1 (Bayless, No. 2:09cv00495 DAK (D.Utah May 17, 2012)).

. Although Ms. Bayless's briefs on appeal argue vigorously (and, in my view, correctly) that her claim was timely if we accept the facts submitted by the government as undisputed, they nowhere argue that this court should grant relief she did not seek in district court — that is, that we should rule her claims timely as a matter of law without giving the government an opportunity to present further evidence or argument.